954 A.2d 537 (2008)
402 N.J. Super. 409
BERK COHEN ASSOCIATES AT RUSTIC VILLAGE, LLC, Plaintiff-Respondent,
v.
BOROUGH OF CLAYTON, Defendant-Appellant.
No. A-4988-05T2.
Superior Court of New Jersey, Appellate Division.
Argued October 11, 2007.
Decided September 8, 2008.
*538 Gary M. Marek, argued the cause for appellant (Law Offices of Gary M. Marek, and Law Office of Timothy D. Scaffidi, attorneys; Timothy D. Scaffidi, Glassboro, and Mr. Marek, on the brief).
Stephen E. Samnick, West Caldwell, argued the cause for respondent (The Samnick Law Group, attorneys; Mr. Samnick, on the brief).
Before Judges AXELRAD, SAPP-PETERSON and MESSANO.
The opinion of the court was delivered by
AXELRAD, P.J.A.D.
In this appeal we address whether N.J.S.A. 40:66-1.3 requires a municipality that provides its residents with curbside pickup of solid waste to provide onsite dumpster pickup at an apartment complex or otherwise reimburse the cost of the service. Following a hearing, the trial court directed reimbursement, concluding the curbside collection on the public street adjacent to the apartment complex was a "lesser service" and "not the functional equivalent of the safe and secure trash removal enjoyed by other residents of the community." We hold that the municipality's offer to the apartment complex of curbside pickup satisfied its statutory obligation to provide the solid waste service "in the same manner as provided to the residents of the municipality who live along public roads and streets" and reverse.

I.
Plaintiff Berk Cohen Associates at Rustic Village, LLC is the owner of a seven building, 164-unit garden apartment complex housing approximately 500 residents, located in Clayton. The complex accesses onto a public roadway, Delsea Drive, by a 380-foot entrance road. Plaintiff also owns the vacant property adjacent to Delsea Drive contiguous to the Rustic Village complex. The apartment buildings range in location from about 500 to 1000 feet from Delsea Drive. Plaintiff had provided onsite dumpsters and recycling receptacles for its tenants to dispose of waste, and had paid for twice weekly removal by a private hauler.
On February 27, 2001, the Legislature enacted N.J.S.A. 40:66-1.3, requiring a municipality that elects to provide its residents with solid waste services to reimburse *539 a multifamily dwelling[1] for the actual cost of providing that service in accordance with the statutory calculation defined in N.J.S.A. 40:66-1.5 or provide the service "in the same manner as provided to the residents of the municipality who live along public roads and streets." N.J.S.A. 40:66-1.3 provides, in pertinent part:
a. Except as otherwise provided in subsection b. of this section, when solid waste collection services are provided to the residents of a municipality, the governing body of that municipality shall reimburse a multifamily dwelling for the actual cost to the multifamily dwelling of providing that service, but not more than the amount that the municipality would have expended on the solid waste collection services if provided by the municipality directly to the multifamily dwelling, calculated as if the dwelling units were located along public roads and streets and the service provided curbside. Alternatively, when solid waste collection services are provided to the residents of a municipality, the governing body of the municipality shall provide the solid waste collection services in the same manner as provided to the residents of the municipality who live along public roads and streets.
b. (1) Nothing in P.L. 2001, c. 25 (C. 40:66-1.2 et al.) shall require a municipality to operate any municipally owned or leased vehicles or other equipment, or to provide any of the services enumerated in subsection a. of this section, upon, along or in relation to any road or street in a multifamily dwelling complex which either (a) is not accepted for dedication to public use or (b) does not meet all municipal standards and specifications for such dedication, except for width.
. . . .
e. No municipality shall be liable for the provision of any solid waste collection services or for the payment of any reimbursement amounts with regard to solid waste collection services to any multifamily dwelling except as specifically provided pursuant to P.L. 2001, c. 25 (C. 40:66-1.2 et al.).
[L. 2001, c. 25, § 2, eff. Feb. 27, 2001.]
The aforementioned reimbursement or provision of services commenced for local budget year 2002 for municipalities operating on a calendar year and local budget year 2003 for municipalities operating on a State fiscal year basis, with reimbursement payments phased in over a five-year period. N.J.S.A. 40:66-1.3d; N.J.S.A. 40:66-1.5.
The Borough of Clayton (Borough) provides free weekly curbside garbage and trash collection service to its residents pursuant to Chapter 60 of the Clayton Code. By letter of October 8, 2002, plaintiff sought reimbursement from the Borough for the first phase percentage of its trash collection expenses for the year, noting it would continue to forward quarterly invoices. By letter of February 13, 2003, in accordance with N.J.S.A. 40:66-1.3, the Borough offered to collect plaintiff's apartment residents' trash and recyclables once a week by curbside pickup along Delsea Drive, the public roadway adjacent to the complex. The Borough instructed plaintiff to comply with all provisions of Chapter 60, including properly containerizing the trash for pickup. Plaintiff responded by letter of March 10, 2003, referencing its reimbursement claim and informing the *540 Borough that its "offer of curbside pickup along Delsea Drive [was] impractical and unhealthy" but it would authorize curbside pickup in the complex as an alternative to the Borough's statutory reimbursement obligation for 2003.
Conversations and letters ensued during the latter part of 2003, and by letter of December 26, 2003, the Borough reiterated that it would not reimburse plaintiff for private container services and would pick up the tenants' trash on Thursdays and recycling on Fridays that were placed for collection in the appropriate containers along the curb line of Delsea Drive. On March 25, 2004, the governing body passed Resolution 77-2004 authorizing collection of plaintiff's residents' trash in accordance with the statutes, regulations, and Borough Code.[2]
On April 1, 2005, plaintiff apparently replaced its onsite dumpsters with onsite corrals and directed its tenants to place their trash bags in containers located in the corrals. On or about April 6 and April 13, 2005, plaintiff's maintenance staff placed its tenants' trash curbside on Delsea Drive. Plaintiff determined the arrangement was inconvenient and unsanitary, discontinued the curbside collection, and resumed utilization of its twice weekly onsite dumpster trash removal. The Borough refused to pick up the trash inside the complex or reimburse plaintiff for its dumpster waste disposal costs.
On July 6, 2005 plaintiff filed a complaint in lieu of prerogative writs against the Borough. Plaintiff sought judgment for the statutory percentage of reimbursement costs of waste disposal totaling $17,323.09 from 2002 through 2004, with accruing costs (First Count). In its Second Count, plaintiff asserted the following allegations:
5. The ordinance as and adopted by the Township of Clayton, was made intentionally labor intensive requiring employees and tenants to sort and place the waste from the apartment complex, into garbage units, and to place the waste receptacles on Delsea Drive. Said municipal ordinance is an unreasonable restriction, constitutes an abuse of the police power, and a form of invidious discrimination wherein by ordinance the defendant attempted to negate the statutory scheme envisioned by R.S. [40]:66-1.
. . . .
10. Based upon an internal study conducted by plaintiff, it was determined that the costs of curbside pickup, by Waste Management of Vineland, New Jersey the trash collection service utilized by the Township of Clayton, and the charges made by Waste Management of Camden County, the private collection service utilized by the plaintiff, were not only the equivalent, but in fact, the utilization of dumpsters was more cost effective and represented a viable and sanitary alternative.
11. Despite the fact that actions of the Borough of Clayton, will create both health hazards, and great inconvenience *541 to more than 500 residents at Rustic Village Apartments, the Township has insisted that trash be placed on Delsea Drive, and that individual trash receptacles be utilized, or the defendant has refused to pick up same.
12. On information and belief the plaintiff herein alleges that the Township is attempting to negate the provisions of RS [40]:66-1 et seq. imposing responsibility upon it for garbage collection, by creating terms and conditions that are so oppressive, that management, as it has done here, will resort to the utilization of dumpsters, as opposed to forcing tenants to carry garbage to the curbside creating management, health and safety risks.
Plaintiff sought judgment: (a) requiring the township to collect the garbage from plaintiff's complex by the utilization of the onsite dumpsters, and (b) declaring the Borough ordinance(s) requiring curbside pickup along Delsea Drive to be null and void. The Borough filed an answer and separate defenses.
The court conducted a plenary hearing in April 2006, during which plaintiff presented the testimony of Harvey Berk, its managing member; Renee Ely, the Resident Manager of the complex; Robert Willis, a consultant in trash management and collection for multifamily housing facilities; and Louis Vega, a billing administrator of plaintiff's management company. Berk testified the complex had six dumpsters and separate recycling containers scattered onsite, collected twice weekly by the same waste disposal service utilized by the Borough. He expressed the opinion, corroborated by Willis, that the trash can system of garbage collection was old-fashioned and dumpsters were a more efficient and sanitary way of picking up apartment trash. Berk also testified it would take about thirty-five smaller trash containers to equal one dumpster and having such a large volume of containers on the property would create significant storage and sanitary problems. Berk further related that plaintiff paid for trash removal until enactment of the subject statute, after which it demanded the Borough either pick up the trash inside the complex or reimburse plaintiff for its dumpster removal costs. Berk also testified he made the management decision to return to onsite dumpster collection after the two attempts at curbside pickup in April 2005 because "it was very inconvenient for the tenant population[,] [a]nd it was unsanitary to be putting trash out on Delsea Drive, which was overnight, which was exposed to animals and winds[;] [i]t was unsightly."
Ely testified about the procedure in preparation for the curbside pickup. She explained they removed the dumpsters and put containers into the corrals and directed the residents to put trash bags into the containers. Ely related that it was inconvenient for the tenants, who were used to twice weekly pickup and had nowhere to store their trash for the entire week; it was unsanitary as there were open bags with baby diapers because many of the tenants had "winged" their bags into the enclosures rather than placing them in the containers, and there were bees swarming all over; and it took the maintenance staff two days to organize the trash from the corrals to take it to Delsea Drive. Ely testified that on or around April 6, 2005, plaintiff's employees placed the trash curbside on Delsea Drive and the Borough had it picked up the next morning. She claimed, however, that after they placed the trash curbside on April 13, the police chief came to her office and threatened to arrest her and her supervisor if the trash was not removed from Delsea Drive by 3:00 p.m. because the trash was unsightly, and as she relayed to Berk, because it was blowing into the street. Berk directed her *542 to have the staff take the trash back to the complex, and plaintiff resumed twice-weekly onsite dumpster removal at its expense.
Willis testified that a dumpster system is the standard in the industry for waste removal for garden apartments. He opined that a collection system using conventional trash cans for solid waste removal was inappropriate for plaintiff's complex in consideration of the health, safety and welfare of its tenants because of the significant number of containers that would have to be utilized. According to Willis' calculations, the Borough's cost of weekly small container curbside pickup was eighty-one percent greater than plaintiff's twice-weekly cost of dumpster trash removal, calculated on the Borough's 2005 total cost of trash collection service[3] per residential unit listed in Waste Management's bid specifications ($403,591.49/2626 units = $153.69 per unit) as compared with plaintiff's actual payment to Waste Management in 2005 for trash and recycling of $13,924.19 for 164 units ($84.91 per unit). On cross-examination, Willis acknowledged his calculation was inconsistent with the April 18, 2005 letter the Borough received from Waste Management (WM). The letter noted plaintiff's current service price was "significantly below average market rates, and is not one that WM will be willing to maintain in the future."[4] Waste Management further confirmed it could provide either rear end loader container services, or traditional curbside services (normal household trash cans and bags) and recycling to plaintiff under the municipal contract at the same price per dwelling unit as the Borough's current contract. The letter further stated that Waste Management currently bills "$14,508.59 for the Borough's 2534 units, or $5.73 per unit[,] [a]t [which] number, for the 166 units of Rustic Village, the additional charge to the Borough by WM would be $951.18[ ]" and the estimated disposal bill would "increase by about $8600.00 per year."
The court accepted into evidence photographs of plaintiff's onsite dumpsters and recycling containers, the corrals, and an April 8, 2005 newspaper article containing a photograph of the tenants' trash bags and cans placed along Delsea Drive. Plaintiff also admitted through Vega a summary and supporting documentation of its trash expenses incurred from 2002 through 2005, which statutory reimbursement percentage (commencing with 20% in 2002) totaled $28,463.06.
Plaintiff argued that requiring application of the Borough's curbside collection ordinance to the garden apartment complex was a denial of equal protection. It urged that onsite dumpster collection was a rational, safe and sanitary method of providing solid waste removal for its 500 residents, who are located 500-1000 feet from the curb of the public roadway, as opposed to a residential home located near the street, and contended that the statute did not require the different entities be provided exactly the same method of trash collection. According to plaintiff, the statute required a municipality to treat garden apartments appropriately, i.e., recognizing they utilize dumpsters, and if a municipality did not want to enter upon the complex for trash removal, which it was not required to do under the statute, the alternative *543 was to reimburse the complex for the cost of dumpster waste removal. Plaintiff challenged the Borough's curbside trash collection ordinance and resolution as a ruse to avoid its statutory responsibility for solid waste removal at garden apartment complexes, arguing the municipal action created an inefficient and unsanitary collection scheme that forced apartment complex owners to utilize onsite dumpsters and thus pay their own trash removal costs. Plaintiff further emphasized that the Borough's decision to require pickup along Delsea Drive rather than reimburse plaintiff's waste management expenses was particularly illogical as it cost the Borough more for curbside collection for plaintiff's 500 tenants than the statutory reimbursement cost of dumpster removal.
The Borough conceded that onsite dumpsters may represent state-of-the-art with respect to trash removal in garden apartments, but responded that pick-up of trash in smaller containers curbside on the public street adjacent to plaintiff's complex was an acceptable method of trash collection. The Borough argued that by agreeing to pick up plaintiff's trash curbside, as it did for all other residents of Clayton, it was in full compliance with the service provision of N.J.S.A. 40:66-1.3.
On April 21, 2006, the court entered an order requiring the Borough to reimburse plaintiff for "costs of trash removal at plaintiff's premises in accordance with N.J.S.A. 40:66-1.3(a)."[5] In an accompanying opinion, the court implicitly determined that application of the municipal code to this particular apartment complex, i.e., requiring curbside pickup in receptacles, did not comply with the statute and was violative of equal protection, based on the following findings:
In April 2005, the management of Rustic Village attempted to comply with the Borough's curbside pickup offer. The results were wholly unsatisfactory in that it created unsightly, unsafe and inefficient disposal as evidenced by Photograph J3E in Evidence and testimony of plaintiff's representatives.
In fact, the credible evidence of Mr. B[e]rk, plaintiff's CEO and Ms. Ely, plaintiff's resident manager demonstrate that the placement of multiple trash receptacles for 500 residents along a busy roadway was entirely unworkable.
The Court determines that these witnesses were credible. Each testified in a direct, articulate and straightforward manner.... Their testimony was unrefuted by the Borough. Indeed, it was corroborated by the photographic evidence which renders their observations self-evident.
After a couple of tries (albeit perhaps unenthusiastic) to comply with the curbside pickup proposal, the plaintiff/owner returned to addressing solid waste disposal by paying for the services of a private hauler. The plaintiff/owner seeks reimbursement of the cost, said reimbursement not to exceed the actual cost of curbside pickup.
....
Specifically, the municipality argues that so long as it offers curbside pickup to the multi-dwelling housing facility, it need do nothing further since providing curbside pickup would be providing solid waste collection services in the same manner as provided to the residents of the municipality who live along public roads and streets [in accordance with N.J.S.A. 40:66-1.3a].
The court noted N.J.S.A. 40:66-1.3 was enacted to implement our holding in WHS *544 Realty Co. v. Town of Morristown, 323 N.J.Super. 553, 560-61, 733 A.2d 1206 (App.Div.), that an ordinance providing free trash collection to all residential dwellings of three or less units as well as certain condominium developments, but not multifamily dwellings of four or more units, was invalid as violative of the latter's equal protection rights because the classification scheme was not rationally related to a legitimate state interest, certif. denied, 162 N.J. 489, 744 A.2d 1211 (1999). See Statement accompanying Senate Bill No. 1903 (209th Sess. 2000) (stating that the legislation "represents a rational method for implementing the reasoning of the court in a fiscally prudent manner. Under this bill ... municipalities have the option of either directly providing services or entering into an agreement to pay the landlord a reimbursement amount."). The court concluded:
The documentary and testimonial evidence presented during the plenary hearing of April 19, 2006 lead to the conclusion that requiring curbside pickup in this instance along Delsea Drive adjacent to this multi-family dwelling is not the functional equivalent of the safe and secure trash removal service enjoyed by other residents of the community. Providing trash removal to all residents of the community in the same manner requires that all residents of the community enjoy a healthful, safe, efficient and reasonable manner of trash removal designed to enhance rather than undermine public safety, health and welfare. Requiring curbside pickup here as the Borough urges is not providing equal service to all residents. Curbside pickup in this instance is unhealthy, unsanitary, utterly inefficient, unsightly and unreasonable. It subjects the residents of the plaintiff property to a lesser status, receiving lesser services and therefore offends the equal protection considerations that gave rise to the Statute in the first place. In fact, requiring curbside pickup in this instance is unreasonable to the point of absurdity. It jeopardizes and offends not only the health and welfare of plaintiff's tenants but all members of the community.
Since the trash removal scheme imposed by the Borough for plaintiff's property is unreasonable, it cannot stand.
Since the Borough of Clayton has chosen, under the Statute, to provide trash removal services to its citizens and since curbside pickup is not an acceptable procedure here, the Borough of Clayton is directed to reimburse plaintiff for the trash disposal expenses. The sum is to be calculated in accordance with the statutory language.
The Borough appealed.

II.
On appeal, the Borough contends the court erred as a matter of law in holding that plaintiff is entitled to reimbursement for its costs for private trash collection and removal services since the municipal actions were expressly authorized by statute and are not violative of equal protection. It alternatively submits the matter should be remanded for recalculation of the reimbursement amount based on a determination of the actual costs of curbside service to plaintiff if provided by the Borough.
The Borough renews its argument that it has complied with its statutory obligation as it offered plaintiff weekly curbside pickup of trash, which is the identical type of solid waste removal it provides to its residents who live along public roads and streets and thus constitutes "services in the same manner" under N.J.S.A. 40:66-1.3. The Borough emphasizes that the Solid Waste Disposal statutes afford a *545 municipality discretion in the type of service provided to its residents, not requiring entry upon private property and expressly permitting limitation to curbside collection upon dedicated public streets, as well as contemplating curbside trash pickup in containers smaller than the dumpsters utilized by plaintiff. See N.J.S.A. 40:66-1b ("A municipal governing body that establishes a system for the collection or disposal of solid waste pursuant to [N.J.S.A. 40:66-1a], in its discretion, may limit service furnished by it to curbside collection along public streets or roads that have been dedicated to and accepted by the municipality [and] may also refuse to enter upon private property to remove solid waste from dumpsters or other solid waste containers." (emphasis added))[6]; N.J.S.A. 40:66-1.3b(1) ("Nothing in ... (C. 40:66-1.2 et al. [Solid Waste Collection Services for Multifamily Dwellings]) shall require a municipality ... to provide any of the services enumerated in subsection a. of this section, upon, along or in relation to any road or street in a multifamily dwelling complex which ... is not accepted for dedication to public use....").
Moreover, the Borough argues the court erred in finding curbside trash pickup to plaintiff to be an equal protection violation. The Borough contends its trash collection ordinance, which is presumptively valid and constitutional, provides all of its residents with the same service  curbside trash collection  upon the same terms and conditions. According to the Borough, the inefficiency of curbside garbage collection service for an apartment complex and the logistical problems of transporting the tenants' trash a greater distance to the public roadway than a single family home adjacent to the street does not render the municipal ordinance violative of equal protection. As emphasized by the Borough, aesthetic preferences and convenience are not suspect classifications implicating equal protection principles. See Pleasure Bay Apts. v. City of Long Branch, 66 N.J. 79, 95, 328 A.2d 593 (1974) (holding municipal action to limit garbage service to curbside collection on public streets adjacent to garden apartment complexes did not amount to invidious discrimination).
The Borough submits that plaintiff presented no testimony that the risks inherent in curbside trash collection at its complex presented health, safety, or welfare risks not presented by other instance of curbside trash pickup in the Borough. It further submits that in conducting its equal protection analysis the court incorrectly focused on items such as the physical characteristics of the apartment complex, difficulties in plaintiff availing itself of curbside garbage collection services, and aesthetic, health and welfare issues connected with curbside trash collection. Moreover, according to the Borough, rather than comparing the services offered to plaintiff with those provided to all other residents of the Borough, i.e., weekly curbside pickup of solid waste and recycling, the court also inappropriately compared and assessed the relative merits of use of an onsite dumpster system with curbside trash collection in smaller containers. The Borough emphasizes that the appropriate equal protection inquiry before the court was not whether the municipality should bear the expense of plaintiff's business decision to utilize onsite dumpsters because they are more aesthetically pleasing or efficient. Rather, it was whether there was a rational basis for limiting the Borough's *546 garbage service to plaintiff to the same curbside pickup offered to its other residents, a discretionary determination that was upheld by the Court in Pleasure Bay.
The Borough thus contends it has the police power and statutory discretion to consider the advantages of onsite dumpsters for apartment complexes, as well as the unsightliness and risk of toppled containers and wind-blown trash along Delsea Drive, a pitfall of curbside collection faced by every other resident, and then to choose whether to reimburse plaintiff's solid waste collection costs or to provide it curbside collection. As the Borough selected the municipal service alternative under N.J.S.A. 40:66-1.3, which plaintiff did not utilize, the Borough submits the order for reimbursement must be reversed.

III.
A municipality is not mandated to furnish a municipal service for garbage or other waste removal. Pleasure Bay, supra, 66 N.J. at 90, 328 A.2d 593; WHS Realty Co., supra, 323 N.J. Super. at 562-63, 733 A.2d 1206. However, a municipality which chooses to provide such service may, in the exercise of its authorized police power in guarding the public health, enact ordinances or other regulations and impose reasonable restrictions governing the collection and removal of solid waste. Pleasure Bay, supra, 66 N.J. at 85, 328 A.2d 593; WHS Realty Co., supra, 323 N.J.Super. at 563, 733 A.2d 1206. Our Legislature expressly granted a municipality such power in 1937, stating in N.J.S.A. 40:66-1a that a municipality "may provide for the ... collection or disposal of solid waste, and may establish and operate a system therefor...."[7]
In 1974, 174 and 240-unit apartment complexes, which utilized onsite dumpsters and paid for trash disposition by private haulers, filed actions to compel municipalities that offered garbage collection services at municipal expense to provide them with free removal of garbage from the dumpsters. Pleasure Bay, supra, 66 N.J. at 82, 328 A.2d 593. The plaintiffs contended the municipalities' denial of such services, while furnishing curbside collection to properties which could effectively avail themselves of the services, was arbitrary and unreasonable and constituted a denial of equal protection. Ibid. The plaintiffs emphasized that: (1) only a small minority of the apartments in the complex fronted on the public street, requiring some trash to be carried 600-700 feet to the curb, creating an unreasonable burden on the tenants and essentially negating the offer of service to all but those few apartments fronting on the public street; and (2) placement of the large number of individual garbage cans along the private road would present an eyesore and a health hazard. Id. at 92, 328 A.2d 593.
The New Jersey Supreme Court upheld the municipal regulations limiting garbage service to curbside collection on public streets adjacent to the premises to be served and determined the municipalities were not obligated to collect garbage from within the garden apartment complexes. The Court rejected the trial court's ruling that refusal of the municipality to enter upon the premises of the apartment complex and collect garbage from the onsite dumpsters was a "denial of equal protection because the physical situation of the complex made it impractical for the plaintiffs to avail themselves of curbside garbage *547 collection service." Id. at 91-93, 328 A.2d 593. Quoting David v. Vesta Co., 45 N.J. 301, 314-15, 212 A.2d 345 (1965), the Court articulated the principles of equal protection as follows:
* * * The equal protection clause of the Fourteenth Amendment does not deprive the State of the power to classify in the adoption of police laws, but allows wide discretion, precluding only that done without any reasonable basis and therefore purely arbitrary. The constitutionality of a legislative classification is presumed, and one who assails the classification must carry the burden of showing its arbitrariness. A classification having some reasonable basis is not invalid merely because it is not made with mathematical nicety or because in practice it results in some inequality. And the classification must be upheld if any set of facts can reasonably be conceived to support it. In short, the equal p[ro]tection clause forbids only invidious discrimination. * * *
[Id. at 93, 328 A.2d 593.]
The Court further elaborated:
The principles thus stated apply to all legislative actions by the state or municipality  both those imposing burdens and restrictions and those granting privileges or providing for the furnishing of services at the expense of the government. All that is required is that the classification "rests on real and not feigned differences."
[Id. at 94, 328 A.2d 593 (citations omitted).]
The Court in Pleasure Bay held the municipalities' determinations to limit the garbage service furnished by them to curbside collection did not amount to invidious discrimination, concluding the classification resulting from the limitation was based on "real and not feigned differences in the problems inherent in collection of garbage from locations within a landowners' premises as contrasted with collections from the curbside." Id. at 94-95, 328 A.2d 593. The Court found it to be of "no legal significance that plaintiffs, because of the physical characteristics of their apartment complexes, find it impracticable to avail themselves of the curbside garbage collection services offered," as "`[a]n otherwise valid statute or ordinance conferring a privilege, is not rendered invalid merely because it chances that particular persons find it hard or even impossible to comply with precedent conditions upon which enjoyment of the privilege is made to depend.'" Id. at 96-97, 328 A.2d 593 (citation omitted). It also found the trial court's emphasis on the supposed burden to tenants to be unjustified, noting the tenants had the benefit of regulations imposing a duty on the property owner to provide adequate garbage storage and disposal facilities. Id. at 92, 328 A.2d 593.
Additionally, the Court recognized at least two constitutionally proper bases for a municipality to limit trash collection to curbside service. It expressly rejected an analysis of the municipality's cost in collecting garbage from dumpsters within the apartment complex and removing that garbage from cans placed at curbside and focused on the expense of providing onsite collection service to other property owners, stating:
The Teagen[8] court's limitation of comparison costs to the costs of removal of garbage produced at plaintiff's complex was unwarranted. It overlooked that if the municipality were to provide garbage *548 pickups from the sites within the apartment house complex at which garbage was stored in dumpsters, it would find it difficult, if not legally impossible, to refuse to provide on site collection service to other property owners who are now required to carry their own garbage cans to the curbside to be collected. Providing on site collection services throughout the municipality would be substantially more costly, a factor which alone furnishes a reasonable basis for the municipal decision to limit its garbage collection services to collection from the curbside.
[Id. at 96, 328 A.2d 593.]
The Court also found it to be "neither arbitrary nor unreasonable for a municipality to seek to avoid [the] problems" of onsite collection "stemming from entries into the private property to be serviced and the means used in emptying dumpsters" by limiting its services to curbside collection. Ibid.
In 1991, the Legislature amended N.J.S.A. 40:66-1 to add subsection (b), expressly granting a municipality the discretionary powers to: (1) limit garbage collection services furnished by it to curbside collection along public streets and to refuse to enter upon private property to remove the garbage from dumpsters or containers; and to (2) reimburse property owners who elect not to receive municipal collection services. L. 1991, c. 213, § 1, effective July 23, 1991.[9] According to the accompanying Assembly Municipal Government Committee's and Senate County and Municipal Government Committee's Statements, the bill codified the holding in Pleasure Bay. We upheld the constitutionality of the statute. Property Owners & Managers Ass'n v. Mayor and Town Council of Parsippany-Troy Hills, 264 N.J.Super. 538, 624 A.2d 1381 (App.Div.), certif. denied, 134 N.J. 561, 636 A.2d 519 (1993).
In 1999, we invalidated a municipal garbage collection ordinance providing free trash collection service to all residential dwellings of three or less units and excluding all multifamily dwellings of four or more units as violative of the latter's constitutional rights to equal protection. WHS Realty Co., supra, 323 N.J.Super. at 553, 733 A.2d 1206. In response, the Legislature enacted N.J.S.A. 40:66-1.3, requiring municipalities that provide residential trash collection to either reimburse the multifamily dwelling for the cost of collection, capped at the municipality's curbside cost, or provide it with the collection services "in the same manner as provided to the residents of the municipality who live along public roads and streets." This statute essentially paralleled the existing legislation applicable to qualified private communities, N.J.S.A. 40:67-23.3.
The Legislature did not make any significant changes to N.J.S.A. 40:66-1b, which codified a municipality's right to limit its waste removal service to curbside collection along public streets and to refuse to enter upon private property for dumpster or container pickup. Moreover, N.J.S.A. 40:66-1.3b, similar to the qualified private community statute, expressly contained language reinforcing this concept, stating that in providing its service option, a municipality was not required to operate any equipment or provide any of the solid waste services along non-dedicated streets in a multifamily dwelling complex. The Legislature's sole requirement under the *549 municipal service alternative was that a multifamily dwelling be provided these services "in the same manner," which we interpret as the same type and frequency, as provided to residents who live along public roads and streets.
Based on the Legislative Statement reference to WHS Realty and the plain language of the statutes, it is clear N.J.S.A. 40:66-1.3 was enacted solely to clarify the discretionary choice given to a municipality to reimburse a property owner who did not receive a municipal service, N.J.S.A. 40:66-1b, and preserve equality among its residents by requiring reimbursement to a multifamily dwelling if the municipality did not offer it the same free solid waste collection service. We thus discern no basis in law to engraft on the statute an additional requirement that a municipality that provides curbside pickup of solid waste to its residents also provide onsite dumpster pickup at an apartment complex or otherwise reimburse the cost of the service.
We understand the court's visceral response to the testimony of plaintiff's representative about the state-of-the-art onsite dumpsters and the problems associated with smaller corrals, the burden on the staff to transport the tenants' trash out of the complex to Delsea Drive, the impracticability of plaintiff availing itself of the curbside garbage collection offered, and the eyesore and unsanitary condition created by its brief attempt to place the trash curbside. We agree with the Borough, however, that the court misperceived equal protection principles, focusing on factors that do not give rise to invidious discrimination under the law and assessing the merits of onsite dumpster service over curbside pickup in receptacles rather than comparing the services offered to plaintiff with those provided to all other residents of the Borough, i.e., weekly curbside pickup of solid waste and recycling. Thus the court erroneously concluded that curbside pickup offered to plaintiff by the Borough was a "lesser service" than offered to residents who live along public streets and thus was not provided "in the same manner" to satisfy the second alternative of N.J.S.A. 40:66-1.3.
Pursuant to its police power and by statute, a municipality that elects to provide solid waste services to its residents has broad discretion to determine the parameters of the services offered and to impose reasonable restrictions. The municipality has the same discretionary power to choose between reimbursing a multifamily dwelling owner for its cost of collection or providing it with the collection services given to residents who live along public roads. It is presumed the municipality will exercise its police powers wisely and responsibly. Here, the Borough chose the second alternative of N.J.S.A. 40:66-1.3 and by letter of February 13, 2003, offered plaintiff weekly curbside trash and recyclable pickup as provided to all other residents.
Plaintiff chose to wait until April 2005 to place its tenants' trash on Delsea Drive. After only two times, plaintiff decided the arrangement was inconvenient and unsanitary, discontinued the curbside collection, and resumed utilization of its twice weekly onsite dumpster removal.[10] Perhaps if plaintiff had taken advantage of the municipal service on a regular basis, ideally from *550 the outset, the Borough might have reassessed the situation and agreed to increase the size of the receptacles brought curbside, or possibly even decided the reimbursement option was preferable under all the circumstances to curbside pickup on the Borough's major thoroughfare, Delsea Drive.[11] Plaintiff, however, chose not to make a sufficient effort and never gave the Borough this opportunity. Instead it took the position that the Borough was required to provide onsite dumpster pickup or otherwise reimburse the cost of the service. This position is not supported by law. As the Borough satisfied its obligation to plaintiff under N.J.S.A. 40:66-1.3 of providing it with the same type and frequency of solid waste collection services offered to residents who live along public roads, plaintiff is not entitled to reimbursement for its costs of trash removal.
Reversed.
NOTES
[1] "Multifamily dwelling" is defined as "any building or structure or complex of buildings or structures in which five or more dwelling units are rented or leased or offered for rental or lease for residential purposes except hotels, motels or other guesthouses serving transient or seasonal guests. . . ." N.J.S.A. 40:66-1.2.
[2] On February 12, 2004, the governing body amended § 60-2 to reduce the amount of time the receptacles could remain curbside before and after pickup from twenty-four hours to ten hours. In an apparent effort to ease the burden on tenants, it added the following provision:

(b) In the event that the distance from the entrance to the structure which is inhabited is greater than 100 feet to the curbline, or other designated area, then it shall be the responsibility of the owner of the property to transport, or hire someone to transport, any and all garbage and trash, whether recyclable or not, that is to be placed at curbside, or other designated area, for collection.
[3] According to Willis, in 2005, the Borough paid Waste Management Residential Collection $174,115.08, and paid two landfills for disposal, Wheel Grader, $174,945.64, and Gloucester County Improvement Authority, $54,530.77.
[4] Vega believed plaintiff's contract with Waste Management expired December 31, 2006.
[5] The court did not invalidate any of the Borough's ordinances or resolutions.
[6] N.J.S.A. 40:66-1b further states: "The municipal governing body, in its sole discretion, may chose to reimburse those property owners who do not receive the municipal service, but such reimbursement shall not exceed the cost that would be incurred by the municipality in providing the collection or disposal service directly."
[7] The precursor statute was enacted by L. 1917, c. 152, article 23, in essentially the same form.
[8] Teagen Co. v. Bor. of Bergenfield, 119 N.J.Super. 212, 290 A.2d 753 (Law Div.1972), upon which the trial court in Pleasure Bay relied.
[9] In 1989, the Legislature enacted the Condominium Services Act, N.J.S.A. 40:67-23.2 to -23.8, mandating municipalities to provide certain municipal services, including trash removal, or reimburse for such services, to condominiums, cooperatives and other private communities, but not apartment complexes.
[10] Although the Resident Manager made a sketchy reference to an encounter with the police chief on April 13, 2005 regarding problems with the trash which resulted in plaintiff's decision to take the trash back to the complex that day, nothing in the record suggests Borough action impeding plaintiff's ability to avail itself of the municipal curbside trash service for items placed in accordance with the Code.
[11] This is simply an observation of the fluidity of the municipal process in the exercise of the Borough's power to safeguard the health, welfare and safety of its residents, and is not an acceptance of the merits of plaintiff's claim that the amount of trash its residents would generate in small receptacles would constitute a health hazard.